**CHEVRON OIL COMPANY**

v.

**The UNITED STATES.**

No. 220–68.

United States Court of Claims.

Jan. 18, 1973.

Harry R. Horrow, San Francisco, Cal., attorney of record, for plaintiff; Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Kenneth R. Harkins with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on December 27, 1971. Exceptions to the commissioner's findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. It is therefore concluded that plaintiff is not entitled to recover and its petition is dismissed.

## OPINION OF COMMISSIONER

HARKINS, Commissioner:

Plaintiff sues to recover $3,997.17, plus interest, for disallowed claims for refunds of federal documentary stamp taxes and assessed interest paid on two conveyances made in 1964 and 1966. The question presented is whether documents that transfer what are commonly described and known in the oil industry

as "carved out" production payments were subject to the stamp tax then imposed by Section 4361 of the Internal Revenue Code of 1954 on instruments that transferred or conveyed "lands, tenements, or other realty".[1] The conveyances of carved out production payments executed by plaintiff were instruments lawfully subject to the documentary stamp tax. Plaintiff, accordingly, may not recover.

On June 9, 1970, plaintiff and defendant agreed to a stipulation of facts that incorporated fourteen contractual and other documents. The parties, however, could not agree as to which provisions in particular documents should be identified as legally significant for interpretation of the transaction. Plaintiff contended that each of the incorporated documents in its entirety was necessary to provide a proper factual basis for argument and decision. The detailed findings of fact included with this opinion are based upon analysis and consideration of all of the documents incorporated in the June 9, 1970, stipulation. The detailed findings of fact that are involved in the 3-party relationships created in the documents, and the plaintiff's accounting treatment of these transactions, are complex and tedious. Facts significant to the decision are summarized here.

The plaintiff, Chevron Oil Company, is a wholly owned subsidiary of the Standard Oil Company of California, one of the major international oil companies. Chevron is in the business of oil and gas exploration, production, refining and marketing in most of the continental United States, exclusive of certain Western States.

During the period relative to this litigation, it was the practice of plaintiff annually to execute a number of "carved out" production payment agreements. The production payments were carved out of plaintiff's working interests in leased properties.[2]

During the period 1960–65, in the petroleum industry, sales of carved out production payments increased in frequency.[3] During this period, the In-

---

1. 26 U.S.C. § 4361 (1970). The Excise Tax Reduction Act of 1965, Pub.L. 89–44 (June 21, 1965), repealed, as of January 1, 1968, documentary stamp taxes on conveyances of real estate. Section 4361, as amended, reads as follows:

"*Imposition of tax*

"There is hereby imposed, on each deed, instrument, or writing by which any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale) exceeds $100, a tax at the rate of 55 cents for each $500 or fractional part thereof. The tax imposed by this section shall not apply on or after January 1, 1968. * * * *"

2. A production payment is a right to a fixed amount of production from a mineral property, if, as and when the production occurs. Dependent upon the manner in which it is created, a production payment may be classified as either "carved out" or "retained"; it may be for a specific dollar amount, and it usually bears interest. The production payment is secured by an interest in the minerals, and usually the known mineral reserves available are substantially in excess of the amount required for the production payment.

In a "retained" production payment the owner of a mineral interest sells the working interest but reserves the production payment in himself. A "carved out" production payment is created when the owner of a mineral property sells a portion of his future production. It may be carved out of any mineral interest having a duration greater than the interest conveyed. See generally Tax Reform Studies and Proposals, U. S. Treasury Department, Joint Publication of Committee on Ways and Means, U. S. House of Representatives, and Committee on Finance, U. S. Senate, February 5, 1969, pp. 256–263; J. Lane Peck, Federal Documentary Stamp Tax Aspects of Oil and Gas Transactions, 1963 Tulane Tax Institute, pp. 270–292.

3. In 1965 the Treasury Department reported that carved out production payment transactions totaled $214 million. In 1966 reported carved out production

ternal Revenue Code permitted an oil company with a working mineral interest to obtain, from the sale of a carved out production payment, additional ordinary income subject to depletion in the year received. The amounts used to pay the production payment were excluded from income by the oil company during the payout period. The expenses attributable to producing the income necessary to pay off the production payment, however, could be deducted in the year incurred. Sale of carved out production payments permitted an oil company to avoid the statutory provision that limited the percentage depletion deduction to 50 percent of net income from the property in the payment year. Sale of carved out production payments, in addition, permitted avoidance of the foreign tax credit limitation, the 5-year net operating loss carryover limitation, and the 7-year investment credit carryover.[4]

In the period from December 1961 through December 31, 1966, plaintiff executed conveyances for at least 12 carved out production payments for a total consideration of approximately $50 million. The largest, valued at $29.1 million, was made on November 29, 1962, and the smallest, valued at $155,000, was made on December 29, 1966. All of these conveyances were made during the last 6 weeks of the calendar year and 10 were made during the last 2 weeks of December. In all cases, plaintiff's production payments were conveyed to charitable organizations, exempt from federal taxes. Purchase of the production payment was financed by the charitable organization by money borrowed from a banking institution on a promissory note that was secured by a mortgage or assignment of the oil payment. Principal and interest on the loans from the banks were less than the

total to be received by the charity from the plaintiff from the production payments.

With respect to each of the production payments conveyed during the period, the consideration received was reported as ordinary income for federal income tax purposes and a deduction for percentage depletion was claimed. For financial accounting purposes, however, in reports to stockholders, the proceeds from sales of the production payments were not taken into income. The production payments were reflected as current liabilities under "Accounts Payable" in the corporation's consolidated balance sheets, with adjustments as necessary to offset federal tax expense that resulted from inclusion of the amounts in income for tax purposes.

This case is concerned with two of the plaintiff's carved out production payment transactions, a conveyance in 1964 to the Sutter Charitable Foundation, and a conveyance in 1966 to the Thirteen Hundred Foundation, Inc. After audits, the Internal Revenue Service assessed plaintiff an additional $50,951.45 in stamp taxes on nine production payment conveyances made from 1961 to 1965, and an additional $3,177.35 for three conveyances of production payments made in 1966. Plaintiff has paid these assessments, and filed for a refund of $3,785.10 with respect to the Sutter conveyance, and for a refund of $170.50 with respect to the Thirteen Hundred conveyance. The claims were disallowed in full by the Internal Revenue Service. In its claims for refund and in its petition, plaintiff seeks to recover only the tax and interest assessed and paid with respect to the 1964 transaction and the 1966 transaction, and not for other conveyances involved in the deficiency assessments.

payment transactions had more than doubled to a figure of $540 million. Treasury Department Study, *supra* n. 2, at 256.

4. H.R.Rep.No.91–413 (Part 1), 91st Cong., 1st Sess. 139 (1969). Tax Reform Act of 1969, Pub.L. 91–172, 83 Stat. 630, 26

U.S.C. § 636, revised income tax treatment of mineral production payments. As amended, a carved out production payment is required to be treated as a mortgage loan on the property and does not qualify as an economic interest in the mineral property.

On December 29, 1964, plaintiff executed with the Sutter Charitable Foundation, a nonprofit California corporation, a document entitled "Conveyance of Production Payments and Agreement." This document conveyed two production payments from properties offshore Louisiana to Sutter for a total consideration of $3,441,000. On December 29, 1966, plaintiff executed a similar document with Thirteen Hundred Foundation, Inc., a Louisiana nonprofit corporation. The 1966 document with Thirteen Hundred was entitled, "Conveyance of Production Payment and Agreement" and conveyed one production payment from properties in Oklahoma for a total consideration of $155,000.

Essentially, the documents with each of the charities contained the same provisions. In each the plaintiff did " * * * grant, bargain, sell and convey * * * " a production payment to the charity that was payable out of a specified percentage of crude oil or other hydrocarbons to be " * * * produced, saved and sold" from specifically identified properties leased by the plaintiff. The production payments were " * * * payable only out of production * * * " from the identified properties. Each conveyance provided that the charity would receive proceeds from a " * * * percentage of crude oil herein conveyed * * * " plus an additional amount equal to a specified percentage equivalent to interest on the unpaid balance. The documents provided that the production payment conveyed to the charity would " * * * apply to and be a burden upon the oil and gas lease" involved and that the charity's interest would terminate when the gross amount due had been paid.

Each conveyance provided that the charity " * * * shall own all * * * " of the crude oil and other hydrocarbons " * * * allocable to the production payment." In each document, plaintiff was obligated to deliver the charity's oil free of cost to the same parties that customarily received plaintiff's production and on the same terms and conditions.

Each document included an *Habendum and Warranty* clause that stated, in part:

TO HAVE AND TO HOLD the interest hereby conveyed, together with all and singular the rights, privileges, hereditaments and appurtenances thereto in anywise belonging, unto Assignee, its successors and assigns. * * *

Each document specifically exempted plaintiff from personal liability for the production payment conveyed to the charity, and required the charity to " * * * look exclusively to the percentage * * * " of oil conveyed. In the event that cash proceeds from the charities' percentage of oil were not equal to the gross amount of the production payment, plaintiff was not to be liable to any person for the difference.

In each document, the production payment conveyed to the charity was to continue until the gross amount was paid or for a maximum period of 15 years. Prior to execution of the documents, plaintiff and the charity had exchanged estimates that indicated the production payments would be paid out in a substantially shorter period than the 15-year maximum term. The 15-year maximum term was not intended by the parties to coincide with the actual term of the production payment payout.

The consideration paid to plaintiff for the production payment was obtained by each charity by bank loans simultaneous to the transfer of the production payment. Sutter borrowed $3,441,000 from the Wells Fargo Bank of San Francisco, California, on a demand promissory note, secured with a "Collateral Mortgage of Mineral Rights." Thirteen Hundred borrowed $155,000 from the Whitney National Bank, New Orleans, Louisiana, on a demand promissory note, secured by a "Collateral Assignment of Production Payment."

The $3,441,000 that plaintiff received from Sutter in 1964 and the $155,000 re-

ceived from Thirteen Hundred in 1966 were reported as ordinary income on the consolidated federal income tax return which was filed by Standard Oil Company of California. A depletion deduction was taken with respect to these amounts on the returns for tax years 1964 and 1966. For accounting purposes other than income tax reporting, however, the principal amounts received from the sale of the production payments were not included in revenues for the respective years. The principal amounts for the production payments provided from the agreements were included under "Accounts Payable" in Standard Oil Company of California's consolidated balance sheet.

Section 4361 of the Internal Revenue Code of 1954 imposed a tax on each " * * * deed, instrument or writing by which any lands, tenements, or other realty sold shall be * * * conveyed." [5] The instruments entitled "Conveyance of Production Payment and Agreement" executed by the plaintiff and the respective charities were instruments that sold and conveyed an ownership interest to a portion of crude oil in place on properties leased by the plaintiff. The production payments conveyed were fractional interests in the mineral leases that were owned by the plaintiff and from which they were carved. In the event production and sale of the crude oil was inadequate to pay out the production payment, plaintiff had no other liability to the charity-purchaser. The charity, however, would continue to be liable on its promissory note to the bank.

Application of the documentary stamp tax to leasehold estates, particularly leases of mineral interests in the extractive industries, has involved developing legal concepts and has not been consistent. Development of the law pertaining to this tax has involved changing concepts on the applicability of local law, differentiation among various types of leasehold interests, and, ultimately, specialized application to conveyances of mineral interests.

Prior to 1941, Treasury regulations on the documentary stamp tax provided that the meaning of the term "lands, tenements, or other realty" was determinable by the laws of the state in which the property was situated, and that leases of real property were not subject to the tax.[6] In Morrow v. Scofield,[7] in 1940, the taxpayer appealed Internal Revenue Service application of the tax to the assignment of oil and gas leases in Texas on the ground that the tax would not have uniform application because the same instrument would be taxable in Texas, where it conveyed title to an interest in land, but not in Louisiana, where it passed a servitude on the land. In *Morrow*, the court reversed the concept that local law should determine what is land or realty and ruled for uniform application of the tax in all states. The court affirmed application of the tax and said:

We cannot agree with appellant. The Texas decisions aside, and they are uniform to the effect that mineral leasehold interest are interest in lands, tenements or other realty, we think the comprehensive language of the federal statute makes it quite plain that it was the intention of Congress to require the affixing of stamps to instruments of this kind, instruments which in substance convey interests in lands, tenements or other realty without regard to the particular legal effects and consequences which

---

5. 26 U.S.C. § 4361 (1970).

6. Treas.Reg. 71 (1932 ed.), Arts. 84(a) and 108. The stamp tax on documents was first enacted in 1917, and reenacted by successive Congresses until 1926. After a lapse in the 70th and 71st Congresses, it was reenacted in 1932 and each succeeding Congress until 1941 when the 77th Con-

gress made it a permanent tax. Phillips Petroleum Co. v. Jones, 176 F.2d 737, 738 (10th Cir. 1949), cert. denied, 339 U.S. 904, 70 S.Ct. 518, 94 L.Ed. 1333 (1950).

7. Morrow v. Scofield, 116 F.2d 17 (5th Cir. 1940), cert. denied, 313 U.S. 573, 61 S.Ct. 961, 85 L.Ed. 1531 (1941).

may be attached to them by the laws of a particular state.[8]

The *Morrow* ruling was incorporated in Treasury regulations on November 25, 1941.[9] As amended, the regulation provided that stamp tax liability was not to be controlled by state law definitions of land or realty. State law determined the character of the rights conveyed, but federal law determined when and how they were to be taxed. With respect to leasehold interests, the amended regulations provided that "Ordinary leases of real estate for a definite term of years" were not subject to tax.[10]

On December 19, 1941, Jones v. Magruder held that an assignment of a lease for 99 years, with a covenant for renewal from time to time forever, on certain lots situated in Baltimore City was subject to the stamp tax.[11] For purposes of the tax, the court included in the words "lands, or other realty" conveyance of an "* * * interest or estate in land constituting a substantial ownership in whole or in part, as distinguished from a mere license or temporary right of possession such as pertains to an ordinary lease."[12] The court emphasized that the tax applied not to the subject matter of lands, tenements, or other realty, but on its *conveyance* by deed or other written instrument.

On August 31, 1942, in the light of *Morrow* and *Jones,* the Internal Revenue Service changed its position on the applicability of the stamp tax to leasehold interests in land.[13] The new policy had prospective application and superseded prior inconsistent memoranda and rulings. Although *Morrow* was concerned with mineral interests, the IRS ruling differentiated taxable leasehold interests from exempt interests on the basis of certainty of the term. The ruling defined taxable leasehold interests as follows:[14]

For the purpose of determining liability for the stamp tax imposed by section 3482 of the Internal Revenue Code, as amended, supra, the phrase "lands, tenements or other realty" embraces those interests which endure for a period of time, the termination of which is not fixed or ascertained by a specific number of years, such as an estate in fee simple, life estate, perpetual easement, etc., and those interests enduring for a fixed period of years but which, either by reason of the length of the term or the grant of a right to extend the term by renewal

---

8. Id. at 19.

9. Treas.Reg. 71, § 113.83 (1941) : Conveyances Subject to Tax.

10. Treas.Reg. 71, § 113.84 (1941).

11. Jones v. Magruder, 42 F.Supp. 193 (D. C.Md.1941). On the desirability of uniform nationwide application of the stamp tax, the court noted :

"It is, however, not probable that Congress intended in this modern taxing act to use the phrase 'lands, tenements, or other realty' in the technical nicety of the common law with respect to interests in lands flowing from a system of feudal tenure which did not exist in this country after the American Revolution. I have been unable to find any legislative history of the statute which throws any light upon the sense in which the words were used; but after considerable reflection I have reached the conclusion that the expression is sufficiently general but nevertheless definite to have a uniform nationwide application. * * * [at 198.]"

12. *Id.* at 198.

13. G.C.M. 23295, 1942–2 Cum.Bull. 271.

14. *Id.* at 275. The General Counsel's definition, substantially unchanged, was incorporated and continues in the regulations. 26 C.F.R. § 47.4361–1(a) (4) (i) (1971) reads in part:

"(4) For purposes of the regulations in this part—

"(i) The term 'realty' includes—

"(*a*) Those interests in real property which endure for a period of time, the termination of which is not fixed or ascertained by a specific number of years, such as an estate in fee simple, life estate, perpetual easement, etc., and

"(*b*) Those interests enduring for a fixed period of years but which, either by reason of the length of the term or the grant of a right to extend the term by renewal or otherwise, consist of a bundle of rights approximating those of the class of interests mentioned in (a) of this subdivision."

or otherwise, convey a bundle of rights approximating those of the class of interests first above mentioned. Thus, for example, a lease of real estate for 999 years, or a lease for 99 years renewable forever or for several succeeding terms is taxable. On the other hand, a lease for five years is not taxable even if the right is granted to renew it for several successive terms.

Characteristics that distinguish leases of mineral interests, and production payments associated with their exploitation, from ordinary leases have been delineated by the Supreme Court in a series of income tax cases that involve application of the depletion allowance. By 1940, the cases had established that oil and gas reserves, and other minerals in place, are wasting assets, and this quality generated relationships in commercial production that required recognition of special interests in land for tax purposes. The production of oil and gas was treated as an operation in which capital assets were consumed in the production of income through the severance of minerals. Thus, the holder of a royalty interest (a right to a specified percentage of all oil and gas produced during the term of a lease) had "an economic interest" in the oil in place that is depleted by severance; cash bonus payments when included in a royalty lease were considered advance royalties, with the same tax consequences; and reserved production payments (the right to a specified sum, payable out of a specified percentage of oil or the proceeds received if, as, or when such oil was produced) were considered to withhold from the grant an amount of oil sufficient to make the agreed payments. The decisions " * * * did not turn upon the particular instrument involved, or upon the formalities of the conveyancer's art, but rested upon the practical consequences of the provision for payments of that type."[15]

In 1949, the G.C.M. 23295 definitions of leases subject to the tax were challenged by Phillips Petroleum Company.[16] This case involved mineral leases in Oklahoma for a stipulated primary term, usually 5 years, " * * * and as long thereafter as oil, gas or other mineral is produced." The leases also provided for termination at the end of 1 year unless a well was commenced and drilled with due diligence, or, in lieu thereof, annual stipulated rentals were paid for the primary term of the lease. Phillips Petroleum contended that the law of Oklahoma and Kansas, as well as earlier federal law, held that such conveyances granted only a privilege to go upon land to explore and produce oil and to reduce it to possession as personalty, and that an oil or gas lease did not constitute a sale of realty subject to the stamp tax. The court ruled that an Oklahoma oil and gas lease, nevertheless, in the light of industry development and practice, for all commercial purposes was realty or an interest in realty, and subject to the tax in uniform application of a nationwide rule. The court stated:[17]

It may be conceded that when judged by the laws of the states of Oklahoma and Kansas, or the general federal law, an oil and gas lease is not realty or an estate therein. But even so, we are concerned only with the meaning and application of a federal excise tax, imposed by Congress in the exercise of its plenary power under the Constitution. It is the will of Congress which controls, and in the absence of express language to the contrary, the Act is to be interpreted to give uniform application to a nation-wide scheme of taxation. The critical language in the act is undoubtedly taken from state rules of property, having their genesis in English feudal law. Its technical definition belongs to antiquity, but it takes its color and content from modern

15. Anderson v. Helvering, 310 U.S. 404, 409–411, 60 S.Ct. 952, 955, 84 L.Ed. 1277 (1940), and cases therein cited.

16. Phillips Petroleum Co. v. Jones, *supra* n. 6.

17. *Id.* at 740, 741 of 176 F.2d.

business practices and the legal relationships they create. * * *

Judicial development of the special nature of mineral leases and mineral production payments culminated in the *P. G. Lake* case. There, the Supreme Court considered five cases that involved the status of carved out production payments for income tax purposes. All five cases were disposed of from an initial premise that " * * * oil payments are interests in land."[18] The Court concluded that the consideration received for the assignment of carved out production payments was taxable as ordinary income, subject to depletion, and not as a long-term capital gain.

Prior to August 31, 1959, the Internal Revenue Service had ruled that conveyances of mineral production payments were not subject to the stamp tax. *P. G. Lake* necessitated a change in this policy that resulted in Revenue Ruling 59–282.[19] The 1959 ruling dealt with conveyances of two reserved production payments, a Primary Production Payment and a Secondary Production Payment, that became effective after the Primary Production Payment was fully liquidated and discharged. Both the Primary Production Payment and the Secondary Production Payment were sold to other parties on the same day that the working interest was assigned. On the basis of the *Phillips Petroleum* case,[20] the 1959 ruling stated that an oil or gas lease conveys an interest in the natural resource content of land, that reserved rights to production payments in an assignment of other interests are retained interests in land in place, and that the assignment of such retained interests in oil, gas and minerals in place is a sale of realty within the meaning of the stamp tax.[21]

In 1966, the concepts that were the basis for Revenue Ruling 59–282 specifically were ruled to be applicable to conveyances of carved out production payments.[22] Inasmuch as there is no practical difference between the "interest in land" that exists in a reserved production payment from the interest that exists in a carved out production payment, Revenue Ruling 66–88 was stated to be an amplification of the 1959 ruling. It has retroactive effect as to conveyances of carved out production payments executed after August 31, 1959.

Taxation of leases and production payments in the extractive industries has experienced a succession of changes that give increasing recognition and effect to the special characteristics that differentiate this commerce from other leasing relationships. A mineral lease conveys an interest in land in place that permits the lessee to reduce to possession and to dispose of part of the land involved. A production payment is a fractional or proportionate interest in a mineral lease, that, when naked without further obligation or guarantee, as here, is a right to reduce to possession and to dispose of sufficient minerals to achieve the value specified. Whether the production payment is reserved out of a transfer of all

18. Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 264, 78 S.Ct. 691, 694, 2 L.Ed. 2d 743 (1958).

19. 1959–2 Cum.Bull. 332.

20. *Supra* n. 6.

21. Rev.Rul. 59–282, 1959–2 Cum.Bull. 332, 333, in part states:
"It has been held that the leasing of oil and gas property, which creates in the lessee an interest in the natural resource content of the land, is a conveyance of realty within the meaning of section 4361 of the Code and is subject to the tax imposed by that section. See M.T.

16, C.B.1943, 1170; Phillips Petroleum Co. v. Jones, *supra.* To the extent that the assignors reserved to themselves the right to the production payments, they excluded from the assignments of their interests in the leases and retained for themselves interests in the oil, gas and minerals in place. It is held, therefore, that the sale, by the assignors, or such retained interests in the oil, gas and minerals in place is a conveyance of realty sold within the meaning of section 4361 of the Code and is subject to the tax imposed under that section."

23. Rev.Rul. 66–88, 1966–1 Cum.Bull. 258.

other interests in the mineral in place, or is carved out of a larger interest, the holder of the production payment owns the same kind of an interest in the land. Instruments that transfer such rights, whether a lease, a retained production payment, or a carved out production payment, convey an interest in "land, tenements, or other realty" for purposes of the stamp tax.

Plaintiff contends that the transactions with Sutter and Thirteen Hundred, and the banks, when considered in their entirety, at most involved the conveyance of a security interest, exempt from the stamp tax by section 4362(a) of the Internal Revenue Code. The security interest created and transferred in the documents was to be used only to provide for contingent liabilities or to assure performance of contractual obligations.

The agreements among the three parties involved in these transactions clearly involve more than a simple secured debt. The instrument, "Conveyance of Production Payment and Agreement," that plaintiff transferred to the charities differed materially from the instruments that the charities executed for the banks to evidence a secured debt. Plaintiff was not personally obligated, or a guarantor of the production payment, until the oil had been produced, saved and sold for its account. In the event, unlikely as it might be in the light of industry technology and experience, that plaintiff could not produce oil from the leased properties, and other agents for the charities were unable to obtain production sufficient to satisfy the production payment, plaintiff would have no obligation to the charities. In such a situation, however, the charities nonetheless would be liable to the banks on their promissory notes. The "Conveyance of Production Payment and Agreement" sold and transferred to the charities an ownership interest to all of the oil, gas and other hydrocarbons that were allocable to the production payment. This was an interest in "lands, tenements, or other realty" and was pledged by the charities to the banks as security for the promissory notes.

Prior constructions of the documentary stamp tax statute by the Internal Revenue Service do not preclude imposition of the tax either to the 1964 conveyance to Sutter or to the 1966 conveyance to Thirteen Hundred. Recognition of the special nature of a mineral lease that distinguishes it from an ordinary lease that conveys a mere right to possession has been a developing judicial and administrative concept. The Internal Revenue Service has adapted its interpretive posture to changes in industry practice as they occurred and were identified. When such adaptations were made, however, in 1942 with respect to leases, and in 1959 with respect to production payments, notice of the change was given and the new rulings were prospective in application. Prior administrative practice is always subject to change through the exercise of the continuing rulemaking powers of the agency.[23]

After *Phillips Petroleum*[24] and *P. G. Lake*,[25] the changing tax law with respect to the nature of mineral leases and production payments preclude reliance on earlier administrative practice relative to either reserved or carved out production payments. The 1959 revenue ruling gave effect to these changes and put the industry on notice that the stamp tax henceforth would apply to such instruments. Although the 1959 ruling was concerned with retained production payments, at that time instruments that transferred unguaranteed carved out production payments embodied similar concepts. The 1966 revenue ruling applied to carved out production payments the concepts that had been announced in 1959. Its retroactivity to 1959 was appropriate.

23. Helvering v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438 (1941).

24. Supra n. 6.

25. Supra n. 18.

■ The production payments plaintiff conveyed to the charities, and all other rights in the agreements, had a maximum duration of 15 years from the effective dates of the agreements. A lease for a fixed period of years, without renewal rights, and for a term that concededly is not lengthy, in the absence of special attributes, would fall into the classification of an exempted conveyance under the Stamp Tax Regulations.[26] A "mineral lease," however, is not the "ordinary" lease that grants only a temporary right to possession. A mineral lease and a production payment gives the right to sever and remove for all time from the underlying mineral reserve all or a proportionate part of the mineral in place. Duration of the term of the right granted is not the significant characteristic that distinguishes a mineral lease from other leaseholds. The fact that the production payments sold by the plaintiff had maximum terms of 15 years does not determine that the instrument should be exempt from the stamp tax.

The 15-year term was not intended by the parties to be coextensive with the payout period of the production payment, and, in fact, all of the production payments were discharged in less than 2 years. Viewed in its entirety, the 15-year term of the production payment and of the rights granted in the agreement was not a substantial aspect of the transaction. The conveyance of a right to produce oil and exhaust a proportionate part of the reservoir, however, was primary to the transaction. By 1959, both judicial and administrative rulings had recognized this characteristic of mineral leases and production payments.

In sum, plaintiff's conveyances in 1964 and 1966 of carved out production payments were subject to the stamp tax then imposed by Section 4361 of the Internal Revenue Code of 1954. The plaintiff is not entitled to recover.

26. Section 47.4361-2(b)(8) provides as an example of conveyance not subject to tax:

ITT GILFILLAN, INC. and International Telephone and Telegraph Corporation

v.

The UNITED STATES.

No. 356-68.

United States Court of Claims.

Jan. 18, 1973.

"(8) Ordinary leases of real property for a definite term of years."